[Civ. No. 19064. First Dist., Div. One. May 15, 1962.]

MARGARET COE, Plaintiff and Appellant, v. SOUTHERN PACIFIC COMPANY et al., Defendants and Respondents.

510

Peckinpah & Hamlin, Peckinpah, Fryer & Karr, Denver C. Peckinpah and William B. Boone for Plaintiff and Appellant.

R. Mitchell S. Boyd, G. Blandin Colburn, Jr., and Dunne, Dunne & Phelps for Defendants and Respondents.

BRAY, P. J.—Plaintiff appeals from a judgment after jury verdict in favor of defendants, and purports to appeal from the order denying new trial.

### QUESTIONS PRESENTED

1. Alleged error in instructions given:
(a) Presumption of use of due care by defendants;
(b) section 575, subdivision (a), Vehicle Code (now § 22451, subd. (a));
(c) failure to instruct on contributory negligence.
2. Other instructions.
3. Exclusion of statement of Mrs. Winther.
4. Cross-examination of Highway Patrol officer as to Fresno City Police report.

### EVIDENCE

Plaintiff was the passenger in an automobile which was struck at a railroad crossing by defendant Southern Pacific Company's switch engine, operated by defendant Ross. Her complaint contained two counts. The first alleged negligent operation of the engine; the second, negligent maintenance of the protective devices at the crossing.

Olive Avenue, Fresno, crosses defendant railroad's right of way on an angle. There are two sets of tracks there running generally north and south. Running parallel with and adjacent to the right of way on the west is Highway 99. On the east side and parallel and adjacent to the right of way is Weber Avenue, a city street. Olive Avenue is wide enough for two lanes in each direction, although there are no lines on the pavement. At about 11:30 p. m. April 5, plaintiff was riding as a guest in an automobile owned and driven by Mrs. Winther. The car came along Olive Avenue traveling west.

Protecting the crossing on the east side was a standard wigwag signal equipped with both a red light in the middle of a swinging disc and a clanging bell. Across the tracks at Highway 99 there were flashing red highway traffic signals coordinated with the wigwag system. The signals start operating when either a northbound train reaches a point 1,050 feet south of the crossing, or a southbound train reaches a point 940 feet north of the crossing.

About 9:30 p.m. plaintiff and Mrs. Winther went to a certain bar and restaurant; plaintiff testified that there she and Mrs. Winther had three alcoholic drinks. Plaintiff remembered getting into Mrs. Winther's car and passing a sandwich shop on Olive Avenue. Thereafter she remembered nothing that happened until after the accident.

Mrs. Winther admitted taking three or four alcoholic drinks at the same bar and restaurant. While about a block away from the crossing Mrs. Winther saw the wigwag signals operating. They had started to operate at least 15 minutes prior to the accident, and continued operating up to the time of the accident. The traffic lights at Highway 99 were blinking in a manner which indicated to her the approach of a train. Two other cars in front of her in the far right hand lane stopped. She came to a stop behind the waiting cars; she then turned her car around the car directly in front of her and into the inside westbound lane, and proceeded on to the railroad tracks without stopping. The collision then occurred.

Mrs. Winther said that as she came up behind the two stopped cars she looked to her right (north) and could see a distance up the track of some 400 or 500 feet, but saw no train or engine approaching. About 350-400 feet to the north a billboard partially obstructed vision of the tracks. The tracks both north and south of the crossing are straight. As she pulled into the inside lane she looked to her left (south) and saw a stopped train with its headlight on, facing north. Apparently it was the habit of the engineers to so stop their trains. The protective devices are such that if, as here, the train is within the signal block the devices will operate whether the train is moving or not. This train she variously estimated was half a block, 150 or 400 feet from the crossing. When she drove upon the tracks she was looking straight ahead and did not see the switch engine until the instant it collided with her car. This switch engine was traveling without any cars, "backwards," that is, with its tender first,

southerly on the westerly set of tracks, the set on the opposite side of the right of way from which the Winther car approached. It was traveling at about 15 miles per hour, with its headlight on the tender end lighted. The speed limit at the crossing is 20 miles per hour. There was testimony that both the engine's bell and whistle were sounding, although Mrs. Winther testified that she did not hear them.

As the engine approached the crossing and when it was about 300-400 feet from it the engineer saw the two cars at the intersection. When about 150 feet therefrom, the engineer saw a third car slowly moving up behind the other cars. It was moving "pretty slow," "possibly five miles an hour." He saw that the wigwag was operating. When about 75 to 100 feet from the intersection he saw the car pull around the other cars. He then started to give a succession of short whistle blasts. When the car began to cross the first set of tracks the engine was not more than 50 feet away, although still not in the crossing. The car was picking up speed to perhaps 10 to 12 miles per hour. As soon as he saw the car enter the easterly track he threw on the emergency brakes. The engineer made no attempt to decrease speed when he saw the Winther car pull around the other cars. He reached for the brake valve when he was sure the car was going to cross the tracks. The brakes took hold near the center of Olive Street just about the time of the impact. The engine struck the right rear of the car, and stopped 114 feet past the point of impact.

Company rules require that when there is danger caused by people on the track or approaching it, a series of short sounds of the whistle shall be given as an alarm. There was a conflict as to what whistles, if any, were given. The engineer and fireman testified that short blasts of the whistle started when the engine was still 50 feet from the crossing. The only whistle heard by the attendant at a nearby gas station was one just before the accident. A highway patrol officer in the near vicinity did not remember hearing any whistle, nor did Mrs. Winther. The engineer of the parked freight did not know whether the switch engine had or had not given the crossing whistle. Another witness knew that the engine had sounded its whistle but was unsure of the nature of the sound and the time when it occurred.

Plaintiff produced evidence that a gate type of signal was in the process of being erected at the intersection, apparently after lengthy negotiations between the city, the Public Utili-

ties Commission and defendant. Its installation was in conjunction with an increase in the speed limit of trains at the intersection from 20 to 50 miles per hour. A traffic count in February, 1953, showed 6,128 vehicles over this crossing, with 24 train movements west and 23 east daily. In the preceding five years there had been eight accidents with one fatality and four personal injuries. Defendants' evidence was that the devices were entirely adequate. Defendant had received complaints about the practice of stopping trains within the area which activated the warning devices.

The evidence of witnesses who talked to or otherwise came in contact with Mrs. Winther after the accident was that she did not appear to have been affected in any way by the drinks she had taken. In a statement allegedly given by Mrs. Winther the day after the accident, and which she testified that she did not remember giving, she stated that she did not stop at any time prior to the accident. Mrs. Winther testified that she did not know where plaintiff was looking as they approached the crossing as Mrs. Winther was not looking at plaintiff.

After the accident plaintiff was found unconscious on the floor of the car, remaining unconscious for three days. She was confused and disoriented for several weeks. She suffered a very severe crushing fracture of the right side of her face, and a general and diffused type of brain damage.

An expert testified that had the engineer commenced to apply his brakes when 98 feet away the Winther car would have gone an additional 27 feet to what it did, thereby getting out of the way of the engine. He also testified that had Mrs. Winther reacted at the time that she was next to the wigwag she could have stopped in time.

It is obvious that Mrs. Winther assumed that the freight train to her left was the cause of the signals operating. When she looked to her right from behind the stopped car she did not see the approaching engine, and she did not thereafter look again to her right when she entered upon the railroad tracks.

No claim is made that the evidence was not sufficient to support the verdict. Plaintiff's contentions are that certain instructions were improper and that certain evidence was improperly excluded and admitted.

1. THE INSTRUCTIONS.

(a) *Presumption of defendants' due care.*

The court instructed that the operators of the train had the right to operate it along the right of way and over

the crossing and that their only duty was to give the statutory signals and to exercise ordinary care in the circumstances. "In the absence of a showing to the contrary, *the law presumes that the operators of the train performed their statutory duties and used such care.* This presumption is evidence for the defendant and it remains in the case until met or overcome by other evidence, if any." (Emphasis added.)

Plaintiff contends that since defendant railroad's employees, the engineer and fireman on the switch engine, testified as to their conduct, the quoted portion of this instruction was erroneous, as the presumption only applies where the person whose claimed negligence is at issue is unable to testify, citing *Gigliotti* v. *Nunes* (1955) 45 Cal.2d 85, 93 [286 P.2d 809], and *Ford* v. *Chesley Transportation Co.* (1950) 101 Cal.App. 2d 548, 552 [25 P.2d 997]. Defendants point out that the engineer and fireman of the switch engine were called by plaintiff and their depositions were taken by plaintiff under section 2055, Code of Civil Procedure. They contend that the rule of *Gigliotti* and the other cases applies only to evidence produced by the party whose negligence is charged, and that the engineer and fireman did not testify as part of defendants' case. ██ While it is true that in none of the cases cited by plaintiff was the evidence of the conduct of the party charged with negligence produced by the adverse party, it would be unreasonable to hold that a party charged with negligence may obtain the benefit of the presumption of due care merely by refraining from putting on the witness stand the employee or employees whose conduct is in question. A study of the cases dealing with this presumption indicates that it applies only where the person in question, because of death or other reason, is *unable* to testify, not merely because he *does not* testify. As said in *Powley* v. *Appleby* (1957) 155 Cal.App.2d 727, 732 [318 P.2d 712], "Appellants are correct in their contention that it was error to accord the benefit of the presumption to the defendant automobile driver as to whom there were no special circumstances preventing him from testifying fully as to all of the circumstances prior to and through the happening of the accident." While this is dicta, as the driver did testify, it illustrates the philosophy of the rule.

*Maertins* v. *Kaiser Foundation Hospitals* (1958) 162 Cal. App.2d 661 [328 P.2d 494, 75 A.L.R.2d 807], involved a malpractice action. A doctor, at the time of the trial, was practicing medicine in Maine "and there was testimony that it

was 'impossible' for him to come to California for the trial.''
(P. 664.) The court instructed that the doctor was entitled
to the due care presumption. Concerning the giving of this
instruction the reviewing court said (pp. 665, 666): ''It is
ordinarily error to give such an instruction where evidence is
produced by the defendant as to the circumstances of his
conduct which is alleged to be negligent. . . . The exception
has so far only been applied where the person whose negli-
gence is in question is either dead or unable to testify because
of loss of memory. . . .

''No court in this state has been called upon to decide
whether a living party without loss of memory who has found
it impossible to appear as a witness is entitled to the benefit
of the presumption. We have grave doubt if the presumption
should extend to such a case but we do not feel called upon to
decide the question.'' The court then pointed out that the
evidence as to the doctor's inability to attend the trial was
insufficient, and said: ''We are satisfied that, even assuming
that a party who found it impossible to testify by his being
unable to attend the trial would be entitled to the benefit
of the presumption, he must in any event prove the facts
which prevented his attendance and not rest upon the state-
ment of his naked and unsupported conclusion.'' (P. 666.)

The philosophy which permits the presumption to be
considered is, that when the person whose conduct is in ques-
tion is unable to testify due to death, loss of memory or other
circumstances beyond his control, the law provides testimony
for him by the presumption of due care. To allow the use
of the presumption where the person merely does not choose
to testify would be illogical and contrary to the reasons for
its use. Thus the driver of an automobile involved in an
action, who, if he testified would have to admit that he was
completely at fault, could merely refrain from testifying
and then have the benefit of the presumption that he was not
at fault.

We are not impressed with defendants' contention
that because the engineer was called by the adverse party
under section 2055 and such party is not bound by his testi-
mony, there was no evidence before the jury of the engineer's
acts and that hence the presumption would apply. If, as
contended by defendants, the engineer's testimony under
section 2055 was without effect, defendants would be in the
ridiculous position of claiming that although the engineer
was in attendance upon the court and fully able to testify,

the presumption would apply merely because defendants did not see fit to put him on the stand. Under the circumstances the giving of the instruction was error.

This brings us to the question as to whether the error was prejudicial.

"Whether the error in the giving of the instruction is or is not prejudicial turns upon the circumstances of the case, including the facts and the remainder of the instructions." (*Stout* v. *Southern Pacific R.R. Co.* (1954) 127 Cal. App.2d 491, 497 [274 P.2d 194].)

The effect of this instruction was that plaintiff, in endeavoring to show negligence on the part of defendants, had not only the duty of overcoming the engineer's own testimony, but, in addition to that testimony, a presumption that the engineer used due care. The fact that the engineer was presumed to use due care strengthened his testimony that in fact he did use due care. The jury were told in this instruction that the presumption was evidence, which remained in the case "until met or overcome by other evidence, if any"; the jury were told in another instruction that the jury were bound to find according to a presumption unless controverted by other evidence; and in a third instruction they were told that they were not bound to decide in accordance with the testimony of any number of witnesses as against a presumption or other evidence satisfying their minds.

It is plaintiff's theory that defendants were negligent in the operation of the switch engine in two particulars: (1) that the switch engine's bell and whistle were not sounded, and (2) that the engineer, seeing the freight train stopped north of the crossing, should have applied the brakes the moment he saw Mrs. Winther's car start to pull around the stopped cars, as he reasonably should have known that one approaching the crossing would assume that it was the freight train for which the wigwags were operating. An application of the brakes at that time would have enabled the automobile to clear the tracks. It is true ordinarily that with the wigwags going, as admittedly they were, the engineer would have the right to assume that a driver would stop his car before entering the railroad right of way. However, here it was a jury question as to whether the circumstances required the engineer who saw the headlights of the stopped train to act more quickly than he did.

In *Powell* v. *Pacific Electric Railway Co.* (1950) 35 Cal.2d 40 [216 P.2d 448], the truck violated section 575, Vehicle

Code, in not stopping before entering the railroad right of way. The court said (p. 46) : "Clearly it was for the jury to determine as a question of fact whether the motorman acted as a man of ordinary prudence under the circumstances in the operation of his train when he first saw the truck on the right of way and assumed its probable procedure." The instruction raised a presumption that the engineer was giving adequate warning of the approach of the engine and exercised due care in not determining from all the circumstances that Mrs. Winther's car was not going to stop. Defendants then had the advantage of the presumption plus the engineer's testimony, whereas in a case in which the presumption is applicable, there is no such double advantage. This placed an unreasonable burden on plaintiff at the outset to overcome this improper presumption.

Taking this instruction with the erroneous instruction concerning a violation by Mrs. Winther of section 575, subdivision (a), Vehicle Code, and after an examination of the entire cause, including the evidence, we are of the opinion that a result more favorable to plaintiff could have been reached in the absence of said errors.

(b) *Section 575, subdivision (a), Vehicle Code (now § 22451, subdivision (a)).*

■■ The court quoted this section (it states when an automobile driver must stop at a railroad crossing) following it with a statement that to prove that a violation of a statute was excusable, so as to overcome the presumption of negligence, the evidence must support a finding that *the violation resulted from causes beyond the control of the violator.* The court specifically advised the jury that this instruction applied to Mrs. Winther only. The portion of the instruction stating that a violation must be shown to have resulted from causes beyond the control of the violator has been held to be erroneous in *Alarid* v. *Vanier* (1958) 50 Cal.2d 617, 624 [327 P.2d 897], and *Hall* v. *Paul Bunyan Lumber Co.* (1960) 177 Cal. App.2d 761, 766 [2 Cal.Rptr. 519].

The question, then, is—is the error prejudicial? Under the circumstances of this case we cannot say that it is not. Section 575, subdivision (a), requires the driver of a vehicle when approaching a railroad grade crossing to stop within 50 feet but not less than 10 feet from the nearest track. The evidence, including Mrs. Winther's own testimony, shows that she did not so stop.

As we hereinbefore stated, one of plaintiff's theories as to

defendants' negligence was that its practice of having its stopped trains operate the signal devices for considerable periods of time caused motorists to develop an attitude of disregard for the warning signals. Mrs. Winther testified that she had had "a fairly common experience" of observing the wigwags at this crossing in operation with a train standing nearby, and persons driving vehicles across the tracks without stopping. There was other testimony to the same effect.

The instruction made Mrs. Winther's failure to stop, negligence as a matter of law, and took from the jury any consideration of the plaintiff's contention that whether by reason of the previous experiences of Mrs. Winther a person of ordinary prudence would have been justified in assuming that the warning devices indicated that the standing train was the sole cause of their operating. As said in *Alarid* v. *Vanier, supra,* 50 Cal.2d at page 624: "In our opinion the correct test is whether the person who has violated a statute has sustained the burden of showing that he did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law." It took also from the jury the corollary contention that the company knew of the practice of the motoring public and should have required its engine to be under control while approaching this crossing, of which the Public Utilities Commission had said in 1951, "There has also been a recent high accident frequency at this crossing." There had been eight accidents at this crossing within the five years prior to 1953.

Defendants point out that the court rather thoroughly instructed that any negligence of Mrs. Winther could not be imputed to plaintiff. However, the error here does not bear on any duty of plaintiff, but it does bear on defendants' duty in relation to Mrs. Winther's conduct. The court said in one of its instructions that Mrs. Winther's conduct was relevant for two reasons: first, because defendants claimed that her negligence was the sole cause of the accident, and secondly, her conduct "is one of several factors in all the circumstances that you must consider in order to determine what happened, how it happened and who, if anyone, is responsible in damages."

From an analysis of the various factors appearing in the record we have concluded that the giving of this instruction and that on the presumption of the use of due care by defendants could have worked serious prejudice to plaintiff.

(c) *Contributory negligence.*

■ Defendants in their answer set up the defense of contributory negligence. However, while both plaintiff and defendants offered instructions on it, the court gave none. Plaintiff offered an instruction to the effect that there was no evidence of contributory negligence, or, in the alternative, one to the effect that if plaintiff suffered a loss of memory as the result of injuries sustained in the accident there was a conclusive presumption of due care on her part. The court refused to give these instructions.

The statement to the jury of the pleadings by the court, the examination of the jurors, the opening statement of defendants before the taking of testimony, and the cross-examination of defendants' witnesses by plaintiff, all indicated that the issue of plaintiff's contributory negligence was in the case. There was evidence from which the jury could have found plaintiff guilty of contributory negligence. Plaintiff was seated in the front seat of the car talking to the driver. She was a licensed automobile driver, had normal sight and hearing, was familiar with the crossing and its signals, driving over it three or four times a week. She necessarily knew that there were two tracks. She was sitting on the right side of the car, the side from which the engine with its headlight shining was approaching. She had a clear view up the track for approximately 400 feet; the wigwag was operating. There was evidence that the engine's whistle was blowing. There was ample time for her to have warned Mrs. Winther to stop anytime after the latter pulled out from behind the stopped cars until she had crossed the first track. All this, opposed to the presumption that she used due care, did not compel a finding of contributory negligence, but would have supported such a conclusion. Therefore, the court could not instruct as a matter of law that there was no evidence of contributory negligence. Hence the court did not err in refusing the proposed instruction that there was no evidence of contributory negligence.

Actually, the court erred in not giving, as requested by defendants, an instruction on contributory negligence. See *Pobor* v. *Western Pac. R.R. Co.* (1961) 55 Cal.2d 314, 324 [11 Cal.Rptr. 106, 359 P.2d 474]: "Even when negligence of a driver may not be imputed to him, the passenger is bound to exercise ordinary care for his own safety. He may not shut his eyes to an obvious danger; he may not blindly rely on the driver in approaching a place of danger. He is nor-

mally bound to protest against actual negligence or recklessness of the driver, the extent of his duty in this regard depending upon the peculiar circumstances of each case and ordinarily being a question of fact for the jury. [Citations.]'' Assuming a similar showing at the retrial, instructions on contributory negligence should be given.

2. OTHER INSTRUCTIONS.

As the case will have to be retried, it is necessary for the benefit of the trial court that we consider the other instructions of which plaintiff complains.

Taking the instruction on burden of proof out of context, it might appear that the instruction required that the plaintiff's evidence must overcome all doubts, a requirement that has been held to be erroneous. (*Banes* v. *Dunger* (1960) 181 Cal.App.2d 276, 282 [5 Cal.Rptr. 278]; *Meschini* v. *Guy F. Atkinson Co.* (1958) 160 Cal.App.2d 609, 615 [325 P.2d 213]; *Greenleaf* v. *Pacific Tel. & Tel. Co.* (1919) 43 Cal.App. 691, 693 [185 P. 872].) However, taking the portions of the instructions complained of in context with the other instructions, it does not have that effect. At the retrial it would be advisable to revise the instruction in the light of *Greenleaf* v. *Pacific Tel. & Tel. Co., supra,* 43 Cal.App.2d 691, 693, so that any uncertainty or ambiguity will be cleared up.

 Likewise, the instruction as to defendants' duties with reference to compliance with section 7604, Public Utilities Code, could be made more clear. While it states that defendants have a duty to give the statutory signals *and* to exercise ordinary care in the circumstances, the use of the words "only duty" in the instruction makes it ambiguous. Moreover, it should more clearly appear that the instruction applies to the engine, not to the freight train. To place a duty of blowing a whistle or ringing a bell on the freight train while it was stopped and not approaching the crossing would only add confusion and would be dangerous, as it might cause a person at or approaching the crossing to mistake the warnings of the approaching engine for those of the stopped train.

 The instruction to the effect that until put on notice to the contrary the engineer and fireman were entitled to assume that persons approaching the railroad would use due care, should contain the statement that these men were entitled to this assumption only if they were using due care themselves. While the requirement appears when this instruction is read in context with the other instructions, it would be

better to include the requirement as a part of the instruction itself.

The instruction on absentmindedness, forgetfulness or preoccupation of the driver of the car was a proper instruction (*Lazzarotto* v. *Atchison, T. & S.F. Ry. Co.* (1958) 157 Cal. App.2d 455, 461 [321 P.2d 29]) except for the words "locomotive and cars." While it is clear from the context the switch engine was meant, the instruction, if used again, should say so.

In order to avoid any possibility of misunderstanding, the instruction on "constant vigilance" at a railroad track should indicate that it applies only to the driver of the car. Requiring the passenger to exercise "constant vigilance" would be requiring a more stringent duty than is required of a passenger, as set forth in *Pobor, supra,* 55 Cal.2d 314.

### 3. MRS. WINTHER'S STATEMENT.

Mrs. Winther testified that she stopped behind the other two cars at the crossing. On cross-examination she was asked about a statement made the day after the accident in which she said that she did not stop. Later plaintiff read the deposition of Officer Cook. In it he was asked as to whether on the night of the accident he had a conversation with Mrs. Winther concerning the accident. Defendants then objected to testimony of the conversations of police officers with various participants unless all the conversations with all the parties to the accident were admitted. Considerable discussion between court and counsel followed, including a discussion in chambers, it apparently being the contention of plaintiff that all of Mrs. Winther's statements to the officer were admissible, and defendants that they were not, and the court holding that they were hearsay. The court in the discussion in chambers stated that there was a good deal of hearsay in the statement made to the officer, but if plaintiff wanted for purposes of rehabilitation her statement that she did stop the matter could be confined to that one point. At no time did plaintiff offer only that statement. Plaintiff insisted upon Mrs. Winther's entire statement to the police officer. The court's ruling as to the entire statement was correct, and not having offered separately the part which would be admissible under the rule of rehabilitation, plaintiff may not complain. On retrial, the evidence should be so limited.

### 4. FRESNO CITY POLICE REPORT.

This report was excluded. However, Officer Cook, who prepared it, had used it while testifying for refreshing his

recollection. In a deposition Highway Patrol Sergeant Back's attention had been called to the statement in this report that Mrs. Winther "had been drinking, not known if ability impaired." He then stated that he concurred with this statement. At the trial he testified that he did not believe that her ability to drive had been impaired by drinking, that it "didn't seem to be impaired at that time." Confronted with his statement in the deposition he was asked whether the deposition refreshed his recollection. The court instructed the jury that the truth or falsity of the conclusion reached by any other officer was not to be considered. "The only purpose, the only value of the testimony, if any, is this officer's reaction to the statement."

There was no error here. The police report was not used as evidence but merely in connection with the sergeant's testimony in the deposition that he agreed with Officer Cook's conclusion in the statement and the sergeant's testimony on the stand that, in effect, he did not agree with it.

The purported appeal from the order denying new trial is dismissed. The judgment is reversed.

Tobriner, J., and Sullivan, J., concurred.

A petition for a rehearing was denied June 11, 1962.